33

1   David S. Bloch (SBN: 184530)
    dbloch@winston.com
2   WINSTON & STRAWN LLP
    101 California Street, 34th Floor
3   San Francisco, CA 94111-5840
    Telephone:    (415) 591-1000
4   Facsimile:    (415) 591-1400

5   W. Gordon Dobie (*pro hac vice* pending*)*
    wdobie@winston.com
6   WINSTON & STRAWN LLP
    35 West Wacker Drive
7   Chicago, IL 60601-9703
    Telephone:    (312) 558-5600
8   Facsimile:    (312) 58-5700

9   Attorneys for Plaintiff MegaFon PJSC

10                    UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                         SAN JOSE DIVISION

13

14

15   MEGAFON PJSC, a Russian corporation     | **Case No. 3:18-cv-06463**

16                    Plaintiff,

17          v.                                  **COMPLAINT FOR FRAUDULENT
                                                 INDUCEMENT, NEGLIGENT
18   HEWLETT PACKARD ENTERPRISE               MISREPRESENTATION, AND
     COMPANY, a Delaware corporation,         VIOLATION OF § 17200**

19                    Defendant.               **DEMAND FOR JURY TRIAL**

20

21

22

23

24

25

26

27

28

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE ACTION ................................................................................................ 1

THE PARTIES .......................................................................................................................... 2

JURISDICTION ....................................................................................................................... 2

VENUE ...................................................................................................................................... 3

FACTUAL BACKGROUND ................................................................................................... 3

ALLEGATIONS ....................................................................................................................... 3

    HPE'S PRE-CONTRACT FALSE REPRESENTATIONS ......................................... 3

        *1.    HPE's RFI Response* ....................................................................... 3

        *2.    HPE's Post-Response Assurances* ................................................. 5

        *3.    HPE's Systemic Misrepresentation of Key Facts* ......................... 9

    THE SELECTION OF HPE ........................................................................................ 9

    HPE'S FAILURES TO PERFORM ......................................................................... 11

    THE CATASTROPHIC FAILURES OF THE HPE-BUILT UDR SYSTEM ........... 13

    HPE'S RESPONSIBILITY FOR THE CATASTROPHIC FAILURES ................... 13

    DAMAGES ............................................................................................................... 15

FIRST CAUSE OF ACTION ................................................................................................. 16

SECOND CAUSE OF ACTION ............................................................................................. 19

THIRD CAUSE OF ACTION ................................................................................................. 21

REQUEST FOR RELIEF ....................................................................................................... 22

DEMAND FOR JURY TRIAL ............................................................................................... 24

MegaFon PJSC, by and through its attorneys, allege upon knowledge as to itself and its conduct, and otherwise on information and belief based on extensive investigation, as follows:

## SUMMARY OF THE ACTION

1.  MegaFon, a publicly traded company, is a nationwide mobile phone operator in the Russian Federation.

2.  In 2011, MegaFon determined that it needed to upgrade its mobile phone network to accommodate LTE communications.  MegaFon circulated an RFI for this upgrade, which specified numerous key elements that would be involved.

3.  MegaFon received expressions of interest from Alcatel, Ericsson, Hewlett-Packard Company ("HPE"),[1] Huawei, NSN, Oracle, Tekelec, and ZTE in response to its RFI.  Following extensive negotiations in 2012, MegaFon awarded the RFI to HPE to rebuild key elements of MegaFon's wireless network in Russia.

4.  HPE's pre-contract representations emphasized that MegaFon would receive the benefits of HPE's extensive and successful experience building out similar projects globally.  HPE assured MegaFon that the new system would have "99.999% reliability." It represented that MegaFon customers would be able to move seamlessly and without disruption throughout MegaFon's service areas in Russia using the nearest MegaFon node (referred to as "Single Federal SIM Card" functionality) to ensure quality telephone service.  And it guaranteed that it could integrate MegaFon's subscriber databases so that each user would be associated with one unique billing record.  Based on these representations from HPE, MegaFon entered into a wide-ranging business relationship with HPE.

5.  But these assurances, and other statements by HPE regarding key elements of the RFI, were intentional misrepresentations.  In reality, HPE did not have the experience or expertise it claimed, had never built out a system of similar scope and complexity, and lacked the technical expertise to do so.  It was unable to build the system as represented to and required by MegaFon.  What

---

[1] On information and belief, Hewlett Packard Enterprise Company is the successor-in-interest to the divisions of Hewlett Packard Company that negotiated the original business deal with MegaFon, and is legally responsible for all events and claims set forth herein.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 1

AmericasActive:12805953.1

was built had nowhere near the touted "99.999% reliability"; the faulty system suffered numerous cascading catastrophic failures, including failures in November 2016, April 2017, and May 2017 that HPE has been unable to fully explain (or repair) to this day.  Certain of these failures resulted in near shutdowns of the MegaFon's cellular network of more than 80 million subscribers.  Imagine a similar shutdown of any large cellular company in California and the corresponding impact on its business and reputation.

6.     MegaFon has suffered substantial economic and reputational damages as a result of these cascading catastrophic failures and other glaring deficiencies in the system that fail to meet the key elements of the RFI and was designed with permanent and irreparable architectural flaws. MegaFon's damages include funds paid to HPE, repair costs, lost customers, and – ultimately – the need to completely rebuilt its UDR system at an estimated cost of more than $28 million.

## THE PARTIES

7.     Plaintiff MegaFon is amongst the largest telecom operators in Russia.  It is a publicly traded joint stock company listed on the Moscow Stock Exchange (MSX: MFON) and headquartered in Moscow, Russia.

8.     Defendant HPE is a Delaware corporation headquartered in Palo Alto, California, with subsidiaries and operating entities in the USA and worldwide.  It was formed on November 1, 2015, when Hewlett Packard Company spun off its enterprise products and services business into a new entity.  On information and belief, this spin-off included all enterprise-related rights, obligations, and liabilities, including those arising from the events set forth herein.

## JURISDICTION

9.     This Court has subject matter jurisdiction over the entire action pursuant to 28 U.S.C. § 1332, because the amount in controversy is over $75,000, plaintiff is a citizen or subject of Russia, and HPE is a citizen of California.

10.     The Court has personal jurisdiction over HPE upon proper service under Federal Rule of Civil Procedure 4(k)(1)(A), as it resides in Palo Alto, California.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 2

AmericasActive:12805953.1

**VENUE**

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (d) because HPE is subject to personal jurisdiction in this District.

**INTRA-DISTRICT ASSIGNMENT**

12.     Pursuant to Civil Local Rule 3-2(c) and (c), this matter should be assigned to the San Jose Division because HPE is based in Santa Clara County.

**FACTUAL BACKGROUND**

13.     In 2011, MegaFon determined that it needed to upgrade its mobile phone network to accommodate LTE communications.

14.     MegaFon circulated an RFI for this upgrade, which involved, among other things, the creation of a new User Data Repository ("UDR") to allow MegaFon's eight regional networks to be integrated into a single Federal network.

15.     Among other things, the express goal as stated by MegaFon was to permit: (a) MegaFon to provide a single Federal network that could be accessed with a Single Federal SIM Card; (b) consistent monitoring and billing (single point of subscriber services administration) across MegaFon's entire service area; and (c) the ability of any service node to service any MegaFon customer directly without routing the signal through the customer's home node.

16.     MegaFon received expressions of interest from Alcatel, Ericsson, HPE, Huawei, NSN, Oracle, Tekelec, and ZTE in response to its RFI.

17.     Following extensive negotiations in 2012, and numerous pre-contract representations by HPE regarding its experience, expertise, and capabilities, MegaFon selected HPE to rebuild key elements of MegaFon's wireless network in Russia.

**ALLEGATIONS**

**HPE'S PRE-CONTRACT FALSE REPRESENTATIONS**

*1.      HPE's RFI Response*

18.     HPE provided its RFI response to MegaFon on February 29, 2012, in both Russian and English.  Numerous key executives at MegaFon, including Yuliana Orlova (Manager of Network and

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 3

AmericasActive:12805953.1

Engineering Procurement), Dmitry Tochilin (Head of RAN & NSS Development), and Sergey Stishenko (Leading Network Support, UDC Project), received and reviewed this RFI response.

19.     In a section of the Response under the heading "Why Choose HP?" HPE described itself as a singular company "with presence in more than 170 countries," boasting "extensive resources to facilitate Megafon's global business activity." .

20.     The Response touted HPE's "[h]aving been a player in this market for several years" and its "industry experience and unmatched breadth of products and services."

21.     The Response made much of HPE's experience: "Among the key value-added differentiators that w[ould] help Megafon evaluate HP as its partner of choice is experience." It said that this experience should give MegaFon the "confidence and assurance" that HPE was "a business partner experienced in the successful deployment of *similar* large-scale IT projects" (emphasis added). HPE also stated that its "HP team of sales and service professionals has the expertise to translate Megafon's requirements into technology solutions."

22.     This "experience" and "expertise" included the representation that HPE had already "designed an architecture to meet the requirements of the largest Telecom operators in the world." In describing this already-designed architecture to be deployed for MegaFon, HPE claimed that "[a]ll BackEnds are active at the same time and contain the same copy of the subscriber D[ata]B[ase]" and "are kept synchronized in real-time."

23.     HPE's representations were false. When HPE made these representations to MegaFon, HPE either knew they were false or (in the alternative) made the representations recklessly as positive assertions without knowledge of whether the representations were true or false. As MegaFon learned only years later, HPE had never successfully designed or deployed a UDR system of similar scale and complexity, and lacked the core technical experience and expertise necessary to successfully implement MegaFon's new UDR architecture.

24.     In addition to its misrepresentations, HPE also omitted material information. HPE failed to disclose and suppressed material facts that it did not have the necessary expertise or experience in designing, nor the ability and skill required to design, a UDR compliant with MegaFon's technical requirements with "99.999% reliability" and that it did not have the capability or the solutions necessary

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 4

AmericasActive:12805953.1

to successfully integrate MegaFon's eight regional networks into a single Federal network. HPE knowingly omitted this information with the intent to induce MegaFon to retain HPE and to enter into the Framework Contract.

**2.    *HPE's Post-Response Assurances***

25.     HPE followed its initial Response with two specific letters of assurance to MegaFon between December 18 and 21, 2012.

26.     The first letter was sent to "MegaFon Management" on December 18, 2012 by US-based HPE executive Amir Einav. Mr. Einav assured MegaFon's management that HPE's "UDR product [wa]s strategic for our portfolio and we plan long term to continually invest and support the product evolution to satisfy our customer's needs around the world." Einav's letter was received and reviewed by at least Andrey Grachev, MegaFon's Head of Network Development.

27.     MegaFon also sought more assurances that HPE would stand behind the UDR system it was offering to design and build.

28.     On December 21, 2012, MegaFon Chief Strategy Officer Alexander Bashmakov received a letter from HPE executive Miguel Carrero, who headed up the relevant HPE business unit in Palo Alto California. Mr. Carrero stated that "[o]ur UDR product is strategic for our portfolio," and assured Megafon that "[p]riming this implementation is a standard business for HP Communications & Media Solutions business unit." Mr. Carrero acknowledged that HPE was proposing to build out a "telecom business critical system[]," and represented that "HP will allocate the best resources in order to secure the bin[d]ing submission by 2013 January 15th."

29.     To assuage MegaFon's concerns about the capabilities of HPE's local resources to implement solutions that would meet MegaFon's needs, Mr. Carrero referenced HPE's "strong local competences." Mr. Carrero's letter also confirmed a call that same day, in which "senior management of our company" confirmed that "HP will supplement the local and regional resources with global experts." To avoid any ambiguity, Mr. Carrero represented that HPE "will select our resources of the overall delivery chain to secure a successful implementation." This again underscored that the full enterprise resources of HPE were being provided to MegaFon, not merely the assets that were available in HPE's Russian representative office.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                    p. 5

AmericasActive:12805953.1

33

30.    HPE's representations were false.   At the time HPE made the representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  As MegaFon learned only years later, HPE had never architected or deployed a UDR system for a company of similar size and with remotely similar challenges.   Moreover, despite promises that HPE was committed to supporting its UDR architecture for the long term, less than five years later it decided to end-of-life the system it sold to MegaFon.  In other words, less than 5 years after the system was installed, HPE informed MegaFon that its new $25+ million system should be replaced.

31.    In a January 29, 2013, presentation to MegaFon's Alexander Sobolev, Andrey Grachev, Igor Ponomarev, Yuliana Orlova, Sergey Stishenko, and Yury Kornienko, HPE claimed to be "the right partner" for MegaFon in part because of "HP accountability."   The Presentation set forth a detailed technical agenda, scheduling approximately ten hours of meetings over a two-day period to discuss the technical aspects of MegaFon's requirements and HPE's proposed solution, including a Single Federal SIM Card.

32.    HPE followed up its presentation with a detailed "Technical Solution" document that it supplied to MegaFon's Igor Shirokov on February 11, 2013.[2]  In this document, HPE once again touted its "combined experience in projects that have been deployed in companies of similar size and with similar challenges as MegaFon," claiming to have delivered "a reliable and modern technological platform."  HPE also claimed to "understand[] the complexity associated with providing complete end-to-end solutions and the need for performance and availability in a network the size of Megafon."  It asserted again that it "*has designed* an architecture to specifically address the requi[re]ments of the largest Telecom Operators in the world."

33.    The Technical Solution repeatedly portrayed to MegaFon was a "NonStop" system that "guarantees the highest levels of performance and reliability required by the Telecom Operators."  This was detailed as "a mature and proven technology" that was "an ideal solution for the most demanding applications (not only in telecommunication but also in the banking business, and stock market)."

---

[2] This Technical Solution document was ultimately attached to the Framework Contact as Exhibit 16.  Its representations were also material to MegaFon's decision to enter into that agreement.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 6

AmericasActive:12805953.1

34.     MegaFon was told that "[t]he NonStop computing platform is specifically designed from the ground up as a completely fault-tolerant ... system and is distinctly designed for business critical online performance," with "its no-compromise ... architecture bring[ing] a completely different level to availability and scale." HPE explained that the various components "of NonStop systems work together to meet all the demanding requirements of a zero latency enterprise ... [n]one of which is more important than fault tolerance, and the hardware architecture is especially designed to achieve fault tolerance for applications." Even if an individual component were to fail, HPE claimed that its hardware was designed to ensure continuous execution of processes and continued access to databases.

35.     The Technical Document stated that in HPE's solution architecture, "[a]ll BackEnds are active at the same time and contain the same copy of the subscriber DB." The Technical Document went on to detail that "the Application Database Synchronization (ADS) ensures that the subscriber data in the data nodes, the BackEnds, are kept synchronized in real-time" without broken records.

36.     The Technical Solution further explained how the Single Federal SIM Card concept was to be implemented to meet MegaFon's requirement for a single Federal network.

37.     HPE's representations were false. At the time HPE made the representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false. As MegaFon learned only years later, HPE had never architected or deployed a UDR system for a company of similar size and with remotely similar challenges. HPE's "NonStop" system in fact stopped repeatedly in 2016 and 2017, causing substantial harm to MegaFon, due to architectural flaws that MegaFon could not detect and HPE did not detect but should have known about. Nor, despite HPE's assurances, was HPE ever able to achieve synchronization between data nodes, meaning that HPE was never able to achieve a single Federal network using a Single Federal SIM Card, as MegaFon repeatedly requested and HPE repeatedly stated that it would deliver.

38.     In numerous pre-contract oral communications between December 2012 and February 2013, the same HPE personnel reiterated to the same MegaFon personnel the assurances contained in its RFI response and proposed technical solution. Among these were:

- HPE's claim to have deployed similar UDR systems for AT&T (80 million subscribers, with nodes in Seattle, Washington, and New York);

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                      p. 7

AmericasActive:12805953.1

- HPE's promise that "[t]he scheme can be scaled to any number of instances";

- HPE's assurance that "[f]or the purposes of the call processing, the nearest to a subscriber Back End is used," in compliance with the MegaFon RFI's "key element" for the nearest node to be used rather than the home node; and

- HPE's commitment to provide "damages for the absence of the contracted functionality."

39.     Among other things, HPE represented that each node would have an identical customer database, synchronized in real time, for purposes of monitoring and billing (single point of subscriber services administration) no matter where a particular subscriber might be.  HPE explained that its solution would allow MegaFon to treat its eight regional networks as a single integrated Federal network, and that the reliability and fault-tolerance of this type of system, which HPE had substantial experience and expertise in building and providing, were unsurpassed.

40.     HPE's representations were false.  At the time HPE's Neri made the representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  As MegaFon learned only years later, the UDR system it deployed for AT&T was unlike the UDR system it proposed to design and deploy for MegaFon; the UDR system it deployed for MegaFon could *not* be scaled to any number of instances and could *not* connect a subscriber to the nearest node rather than the subscriber's home node.  Far from being reliable and fault-tolerant, the HPE-architected UDR was and is prone to catastrophic failures that HPE cannot fix.  Nor did HPE's solution allow MegaFon to treat its eight regional networks as a single, integrated Federal network using a Single Federal SIM Card.

41.     In addition to its misrepresentations, HPE also repeatedly omitted material information.  HPE failed to disclose that it did not have the necessary expertise or experience in designing, nor the ability and skill required to design, a UDR compliant with MegaFon's technical requirements with "99.999% reliability" and that it did not have the capability or the solutions necessary to successfully integrate MegaFon's eight regional networks into a single Federal network.  HPE knowingly omitted this information with the intent to induce MegaFon to retain HPE and to enter into the Framework Contract.

///

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                         p. 8

AmericasActive:12805953.1

### 3. *HPE's Systemic Misrepresentation of Key Facts*

42.     HPE's RFI Response, Letters of Assurance, Presentation, Technical Solution, and other post-RFI oral communications were replete with misrepresentations of key facts, all of which were known to the relevant individuals at HPE.

43.     At no time did HPE disclose that it would be largely building the system for MegaFon from scratch.  Nor did HPE disclose that it had never previously built such a system.

44.     In fact, HPE lacked the necessary expertise or experience to implement the system that MegaFon requested and that HPE claimed to be able to build.

45.     HPE failed to disclose the risks that its proposal entailed, and instead misleadingly represented that it would be providing what was largely an out-of-the-box product.  Instead, what it provided was faulted, after it failed on numerous occasions in 2017, for its low technical maturity by independent consultants hired to assess the causes of those failures.

46.     At the time HPE made the representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.

## THE SELECTION OF HPE

47.     A key reason for MegaFon's UDR upgrade was to be able to integrate its eight different regional networks into a single Federal network using a Single Federal SIM Card.  MegaFon wanted to ensure that its subscribers could go anywhere within MegaFon's geographic footprint and use their mobile devices as if they were local in that location—with the mobile device being serviced by the nearest MegaFon backend rather than being communicated to the subscriber's "home" back-end.  HPE declared that each MegaFon node would have an identical customer database, synchronized in real-time, for purposes of monitoring and billing regardless of the subscriber's location within MegaFon's service area.

48.     The goal of serving every MegaFon subscriber from the nearest backend was a fundamental purpose of the UDR upgrade.  MegaFon communicated this to HPE on numerous occasions, and HPE's various representations to MegaFon recognized the importance of this feature and communicated HPE's ability to achieve it.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                          p. 9

AmericasActive:12805953.1

49. MegaFon relied extensively on HPE's numerous pre-contract representations in awarding the contract to HPE and selecting HPE for its LTE upgrade. Among others:

- MegaFon's internal decision documents included Mr. Carrero's December 21, 2012 letter as an Appendix to the memorandum, which MegaFon cited as "confirming ... direct contractual relations" with HPE, not limited to the Russian representative office.

- MegaFon relied on HPE's "guarantee[ of] the working capacity of the Hardware-Software Complex (*HSC) to be not less than 99.999%" and that "[i]n case of malfunctioning of the HSC ... [HPE] must compensate the losses of the Customer based on the data provided by" MegaFon's commercial department.

- MegaFon relied on HPE's proposal promising to implement "Dynamic SIM Allocation" (the Single Federal SIM Card feature).

50. MegaFon would never have awarded the contract to HPE but for HPE's representations. MegaFon expected "global support" from HPE with a U.S. technical lead.

51. MegaFon also clearly communicated the size of its customer base, its geographic footprint, and its technical expectations to HPE and its representatives on numerous occasions. At every step of the way, HPE repeatedly represented to MegaFon that it not only had the capabilities to meet MegaFon's needs, but had experience and expertise building similar systems. Each time HPE made such representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.

52. Based on its good faith reliance on HPE's repeated assurances and representations, MegaFon awarded its LTE upgrade contract to HPE, which would not have won the contract from MegaFon but for those assurances and representations further stated above. At the time it made its decision to select HPE, MegaFon did not know that HPE had withheld and failed to disclose material information about its inability to meet MegaFon's technical requirements. Had MegaFon known the truth, it would not have selected HPE.

53. The Framework Contract between MegaFon and Hewlett-Packard A.O. was executed on April 16, 2013.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                p. 10

AmericasActive:12805953.1

33

54.    Overall, the Framework Contract made clear that the contracted-for "solution is based on full HP IP – HP software, HP best practices and HP experienced professionals."

55.    The HPE technology was guaranteed to provide "unlimited scalability," which it recognized was "mandatory for the case of MegaFon."  Among other things, HPE represented that it would  to deliver "a System integrated into the Customer Network which will meet requirements of all Technical characteristics of Systems specified in" the technical specifications of UDR system and HPE's UDR solution description discussed above.  HPE also committed to factory testing of its hardware and software prior to deployment.  The Framework Contract also included numerous express warranties provided by HPE.

56.    After the contract was executed, HPE's Alexander Mikoyan, the General Director of HP Russia, wrote on HP letterhead to MegaFon's executive staff on May 20, 2013, in which he reaffirmed HPE's commitments and representations made throughout the selection and evaluation process.  In that letter, Mr. Mikoyan provided assurances that "MegaFon can be absolutely certain about the proposed decision, as *HP has extensive experience in successful implementation of similar project globally*."  Mr. Mikoyan also reaffirmed that HPE was certain that its technical "decisions comply with the principal requirements of OJSC MegaFon's business."

57.    HPE acted with an intent to defraud in that it intended to induce MegaFon's reliance upon its statements and omissions in order to secure a multi-million contract from it.   Indeed, not only did it make such false statements, but in the months and years thereafter, it acted to conceal its wrongdoing all with a goal of defrauding MegaFon.

## **HPE'S FAILURES TO PERFORM**

58.    HPE was unable to provide the system that MegaFon had requested and that HPE had stated it could build in response to MegaFon's technical requirements.

59.    The HPE UDR Architecture provided to MegaFon did not (and still does not) service each MegaFon subscriber from the nearest back end, which was not only a contractual requirement but the fundamental purpose of the upgrade for which MegaFon contracted.

60.    That functionality is simply impossible to provide with the defective UDR architecture that HPE provided to MegaFon, as HPE's own documents admit.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                p. 11

AmericasActive:12805953.1

61.     HPE also repeatedly stated  that each node/back-end would have an identical customer database, synchronized in real-time, no matter where a particular subscriber might be.  At the time HPE made such representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  But HPE never solved this "broken records" problem, which was a contractual requirement.

62.     By August of 2013, MegaFon demanded an action plan from HPE to deal with the open issues of the UDR deployment, which included poor performance of the solution and extremely low productivity of provisioning.

63.     Notwithstanding HPE agreeing to provide a package of free goods and services to resolve MegaFon's financial claims (*i.e.*, penalties for HPE's failures to provide the contracted-for performance) in February 2014, these problems persisted.

64.     In October 2014, MegaFon informed HPE that it would no longer accept delivery of UDR project phases till the critical issues plaguing the UDR deployment were solved.  But these critical issues were *never* solved.

65.     In fact, these issue continued to fester.  In 2015 and 2016, MegaFon signed a series of amendments to the Framework Contract in an ongoing effort to have HPE address the continued inability of its new UDR system to meet the contracted-for technical requirements.  Among other benefits that accrued to MegaFon, Hewlett Packard Enterprise, LLC (of Russia) agreed to provide additional hardware and "guarantee[d] that the additional HW in question is sufficient to avoid issues (related to lack of memory in the operation of UDR and the synchronization of data between UDR nodes."  It was not.  At the time HPE made such representations to MegaFon, HPE either knew they were false or made the representations recklessly as positive assertions without knowledge of whether the representations were true or false.  And, at no time did MegaFon freely and knowingly give up its rights to have HPE perform as represented.

66.     HPE also ultimately upgraded the software for the UDR system, after several false starts and more than 10 defective patches, to a newer version.  But this, too, failed to fix the underlying synchronization problems.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                          p. 12

AmericasActive:12805953.1

67.     Instead, the problem was that the HPE-built UDR system was fundamentally incapable of meeting these key contractual requirements.  Additional hardware and upgraded software were incapable of solving these problems, which could only be fixed by replacing or re-architecting the system from the ground up.

## THE CATASTROPHIC FAILURES OF THE HPE-BUILT UDR SYSTEM

68.     In April and May 2017, MegaFon suffered a pair of catastrophic failures.  In essence, the MegaFon system collapsed due to its inability to prioritize traffic on an internal UDR bus, which enabled a single problem communication to disrupt—and bring down—nearly *the entire MegaFon system*.

69.     In these cascade failures, the Moscow network operations center ("NOC") failed, followed by the overflow NOC at Samara, because the HPE system failed to properly process or discard bad data or defective processes.

70.     Exacerbating these catastrophic failures was the fact that HPE failed to include any monitoring feature to provide MegaFon with real-time data on the performance of its network.

71.     These failures led to significant service outages, and damage claims by MegaFon's end users and mobile virtual network operator partners.  They were caused by HPE's inability to deliver on its promises of a fault-tolerant non-stop UDR solution.

## HPE'S RESPONSIBILITY FOR THE CATASTROPHIC FAILURES

72.     After the outages, over May 20-21, 2017, HPE's Executive Vice President Antonio Neri (now HPE's CEO) claimed to MegaFon's Alexander Bashmakov and Andrey Grachev (amongst others) that "an overload of a subset of solid state drives supporting the subscriber records" caused the outages, notwithstanding his explanation that HPE's "existing system engineering models indicated this should not have caused an outage."

73.     Starting on May 22, 2017, HPE Chief Executive Officer and Chairman of the Board, Meg Whitman, likewise assured MegaFon's CEO that she was personally monitoring, and took responsibility for, the failures.  She communicated this first in a call with MegaFon's Sergey Soldatenkov, Chief Executive Officer and General Director, and subsequently promised to personally monitor activities and outcomes in resolving the issues with HPE's defective UDR system.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                     p. 13

AmericasActive:12805953.1

33

74.     Then-CEO Whitman also (in May 2017) instructed Neri and HPE Chief Information Officer David Sliter to set up a joint in-person review of the failures.

75.     Nevertheless, MegaFon suffered another *UDR system blackout* in Moscow on June 14, 2017.  MegaFon notified Whitman and Neri of this additional failure, and in response Neri declared that HPE has "a great product with hundreds of millions of subscribers deployed globally with a great track record," and promised "a detailed architectural review and improvement plan."

76.     MegaFon did not accept HPE's explanation, correctly believing that HPE was hiding the real root cause of the outages, and faulted HPE for its continued failure to support MegaFon's needs as HPE had repeatedly detailed to MegaFon.

77.     Indeed, just days later and despite HPE's inability to even explain the root causes of the failures, it sought in June 2017 to "close" MegaFon's complaint.  After MegaFon objected, Neri assured MegaFon that "We agree that a permanent solution is not yet in place."

78.     That same month, HPE admitted that the cause of the May failure was that messaging volume had exceeded the capacity of the HPE-installed ServerNet fabric—in short, a designed-in architectural defect that MegaFon could not have detected until the system failed.

79.     MegaFon's Anna Cherkashina and Valentin Polozenko met with HPE's Ken Marchant (Director Mobility Management Solutions Worldwide), Gary Losbaker (Chief Technologist Mobility Management Solutions Worldwide), Rich Gerbeling (Head of Mobility Management Performance Engineering Worldwide), Brad Kenyon (Lead Mobility Management Product Architect Worldwide), and Oleg Neyolov (HPE Megafon Solution Delivery Leader) in Minsk on May 31 and June 1, 2017, but HPE failed to adequately explain the issue, let alone resolve it.

80.     On June 20, 2017, HPE proposed a series of "network stabilization options," which largely involved more CPUs and better monitoring.  However, HPE admitted that the only permanent fix for the faulty and inadequate system it had built was a "strategic re-architecture"—*i.e.*, a do-over of the system for which MegaFon had already paid over $28 million.

81.     Two different groups of independent consultants hired to assess the April and May 2017 catastrophic cascade failures were in agreement as to their causes and an effective solution to those failures.  Both groups of consultants from inside and outside of Russia independently concluded

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                    p. 14

AmericasActive:12805953.1

that the HPE UDR system was fundamentally flawed and an effective solution required that it be re-architected or replaced.

82.     HPE's proposed "network stabilization options" failed to eliminate the root cause of the catastrophic cascade failures.  In essence, HPE suggested adding more computing capacity, but this did not come up with a way to prioritize important traffic or discard defective traffic.  Even worse, HPE's proposed "solution" could not be fully deployed before the end of 2018, at the earliest.  One group of consultants recommended that MegaFon consider using solutions from alternative providers, because they had never seen—in 17 years—situation where a vendor has such a critical failure/defect in design.

83.     The other consultants likewise concluded that HPE's lack of experience and expertise in building such systems, which it misrepresented to MegaFon, created architectural problems in the UDR system built by HPE.  As a result, there was a discrepancy between the required characteristics and the actual functionality of the UDR system.

84.     In a September 2017 meeting, HPE confirmed that the cause of the failures was HPE errors and that the architectural limitations of the current UDR system do not allow for a permanent solution.  HPE admitted that it could not exclude the possibility of additional degradations or failures in the future.

85.     In March 2018 MegaFon put HPE on notice that HPE had inflicted substantial injury on MegaFon and demanded compensation.

86.     HPE refused by letter in June 2018, asserting (falsely) that MegaFon had approved HPE's performance.

## DAMAGES

87.     MegaFon has suffered substantial damages from HPE's conduct.  Specifically:

a.      MegaFon was induced to pay $28 million to HPE for a system that has never met numerous requirements and that fails to provide the fundamental purpose of the contract.

b.      In order to achieve a system that meets its goal, MegaFon will have to spend a substantial amount of money, as much as $28 million, to repair, replace, and/or re-architect its UDR system so that it can obtain the contracted-for functionality that should have been provided by HPE.

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 15

AmericasActive:12805953.1

c.      MegaFon has incurred substantial costs to diagnose the bases for the inability of the UDR system to provide the represented functionality and the root causes of the catastrophic cascade failures, which HPE failed to properly diagnose.

d.      MegaFon has also suffered damages from claims by its end-users and its MVNO partners as a result of the catastrophic network outages and the inability of the UDR system to provide the contracted-for functionality.

e.      In addition, MegaFon has suffered substantial damages to its reputation for providing functional and reliable data services to its customers and MVNO partners as a result of these catastrophic outages and the inability of the UDR system to perform as represented (and as MegaFon's partners and customers expect).

88.      All of these aforementioned damages would have been avoided had MegaFon awarded the contract for its UDR upgrade to a different systems integrator and not reasonably relied upon HPE's promises and assurances of its capabilities, expertise, and experience and the characteristics of the system architecture it was proposing.

## FIRST CAUSE OF ACTION

### FRAUDULENT INDUCEMENT
**(California Law)**

89.      MegaFon incorporates ¶¶ 1-88 by reference.

90.      HPE's U.S.-based agents and employees, including but not limited to Mr. Einav and Mr. Carrero, made numerous misrepresentations of material fact in connection with MegaFon's RFI, including but not limited to those detailed above, and that HPE would deliver a new UDR system that would perform with 99.999% reliability and would meet all of MegaFon's technical requirements, based on HPE's purportedly vast experience with and expertise in similar systems.

91.      Such representations were false when they were made and were made without intent to perform, and HPE knew or was reckless in failing to know that such statements were false at the time they were made.

92.      HPE made these misrepresentations and concealed these material facts in order to induce MegaFon to hire HPE and award it the Framework Contract.  MegaFon reasonably relied on

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                          p. 16

AmericasActive:12805953.1

HPE's misrepresentation in retaining its services and entering into the Framework Contract. rely on its promises that it would be able to meet MegaFon's technical requirements.  The very purpose of responding to the RFI as HPE did, and in providing the post-Response assurances (including the specifics in the Carrero letter and the detailed technical explanation in pre- and post-contract submissions) was to convince MegaFon that HPE had the global expertise and experience to create the touted system to meet MegaFon's needs and to induce MegaFon to award the upgrade contract to HPE.

93.     MegaFon actually relied on HPE's misrepresentations regarding its abilities to meet MegaFon's contracted-for technical requirements.  Even after the RFI Response, MegaFon was unsure whether HPE's proposed solution would meet MegaFon's technical requirements.  Accordingly, MegaFon sought specific assurances from HPE regarding the details and those requirements, and HPE made those assurances.  HPE's assurances and promises induced MegaFon to award the upgrade assignment to HPE.  So too were the specific pre-agreement technical documents and requirements incorporated into the Framework Contract (specifically including Appendix 6, Appendix 9, and Exhibits 11 and 16).

94.     MegaFon's reliance on HPE's misrepresentations was justifiable.  MegaFon did not merely rely on HPE's RFI Response, nor on the vague statements in the December 18 letter.  Instead, MegaFon repeatedly sought specific assurances regarding HPE's experience and capabilities, the technical details of the proposed system, which HPE repeatedly explained would meet MegaFon's technical requirements, and how HPE's proposed solution would meet MegaFon's technical requirements.  MegaFon justifiably relied on HPE's systemic and repeated assurances regarding its experience and capability, in entering into a contract with HPE's Russian representative office.

95.     As late as 2016, HPE was still insisting that additional hardware and software upgrades would resolve the ongoing issues of the HPE-built UDR system and meet MegaFon's contracted-for technical requirements.  MegaFon continued to rely on the misrepresentations of HPE about the causes of MegaFon's ongoing problems with the UDR system and what would be necessary to resolve those problems.  It was not until 2017, following the numerous catastrophic cascading failures that HPE claimed should not even be possible, that MegaFon finally became aware that the UDR system was

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 17

AmericasActive:12805953.1

1   fundamentally flawed and would never be able to meet the contracted-for technical requirements that

2   HPE had continually stated it would meet.

3        96.    Such representations made by HPE during the course of its work on the MegaFon UDR

4   upgrade were false, and HPE knew and/or was reckless in failing to know that such statements were

5   false at the time they were made.

6        97.    Such misrepresentations and concealment of material fact by HPE were made in order

7   to induce MegaFon into entering into the Framework Contract and subsequently permitting HPE to

8   continue to work under that Agreement to try to bring the fundamentally faulty UDR system into

9   compliance with the contracted-for technical requirements.

10       98.    Had HPE not engaged in these actions, MegaFon would not have retained HPE for the

11  UDR upgrade and instead would have obtained the services of another systems integrator; thus,

12  MegaFon would have avoided the costs, business losses, and expenses it has suffered as a result of

13  HPE's fraud.

14       99.    As a direct and proximate result of HPE's fraud and deceit, MegaFon has sustained

15  damages in an amount to be determined by the trier of fact, but in any event not less than $28 million.

16  MegaFon has suffered injury-in-fact from being induced to enter into a contract by HPE's

17  misrepresentations.  MegaFon has invested at least $28 million dollars already in a defective UDR

18  implementation that—despite HPE's promises to the contrary—fails completely, cannot be relied

19  upon, and must either be scrapped or rebuilt.  Not only has MegaFon lost its original investment, but

20  it now faces the prospect of unknown additional repair/replacement costs (estimates of which are as

21  much as another $28 million), claims by MegaFon's end users, MVNO partners, and possibly its

22  shareholders.

23       100.   Additionally, because HPE's omissions and misrepresentations were intentional,

24  malicious, oppressive, and/or fraudulent, they give rise to liability for exemplary and punitive

25  damages, which MegaFon seeks and is entitled to recover according to proof at trial.

26  ///
    ///
27  ///

28

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                    p. 18

AmericasActive:12805953.1

33

**SECOND CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION BY HPE**
**(California Law)**

101.    MegaFon incorporates ¶¶ 1-88 by reference.

102.    HPE misrepresented numerous past or existing material facts, including but not limited to HPE's experience and expertise with UDR implementations.  The (at best) half-truths about HPE's experience with "similar systems" and its proposed technical implementation being a well-known, tested, essentially "out of the box" solution also qualify as misrepresentation of past or existing material facts by HPE.

103.    Through 2016, MegaFon continued to rely on the misrepresentations of HPE about its experience with and expertise in creating and servicing similar systems, and being able to meet the needs of the operators of such systems.  It was not until 2017, following the numerous catastrophic cascading failures that HPE claimed should not even be possible, that MegaFon finally became aware from the reports of its independent failure analysis consultants that HPE had grossly misrepresented its experience and expertise in building systems of such scale, scope, and purpose; that the system was untried and untested rather than an a proven essentially "out of the box" solution; and that the system's designed-in architectural flaws ensure that it will *never* satisfy MegaFon's needs and specifications.

104.    HPE made these representations without reasonable grounds for believing that they were true and in a manner not warranted by the information in HPE's possession.  For example, HPE did not have reasonable grounds to believe that it had experience or expertise in creating systems of "similar" scope, scale and purpose as the one required by the MegaFon Framework Contract.  Nor did HPE have reasonable grounds to believe that its system was proven and tested, and was an essentially an "out of the box" solution.

105.    In short, HPE knew that it did not have experience with or the necessary expertise to successfully handle a project of this scope, scale, and purpose; it also knew that its proposal was unproven, untested, and there was no basis in fact for the assurances that it would meet MegaFon's contracted-for technical requirements.  And HPE knew, or was reckless in failing to know, that its

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                                    p. 19

AmericasActive:12805953.1

representations that additional hardware and/or software upgrades would finally bring its UDR system into compliance with the contracted-for technical requirements could never hold up.

106.   MegaFon, by contrast, had no knowledge and no way to know that HPE was not competent to build out the requested UDR system or that HPE could not ever bring the UDR system it built into compliance with the contracted-for technical requirements.

107.   HPE made these representations to induce MegaFon to enter into the Framework Contract and with the intent that MegaFon rely on them.  The very purpose of providing responding to MegaFon's RFI and providing the numerous and extensive post-Response assurances—particularly the specifics in the Carrero letter, the detailed explanation in the technical documents, and the follow-up confirmatory oral conversations—was to convince MegaFon that HPE had the expertise and experience to create the touted  system to meet MegaFon's needs and to elicit MegaFon to award the contract to HPE.

108.   MegaFon actually relied on HPE's numerous misrepresentations regarding its experience with UDR implementation and the nature of its building of systems of similar scope, scale, and purpose.  Even after the RFI Response, MegaFon was unsure whether HPE's proposed solution would meet MegaFon's technical requirements.  Accordingly, MegaFon sought specific assurances from HPE regarding the details and those requirements, and HPE's repeated assurances, both written and oral, that it had experience with and expertise in creating such systems, were at the very least material to MegaFon's decision to award the upgrade contract to HPE.

109.   MegaFon's reliance on HPE's misrepresentations was justifiable.  MegaFon did not merely rely on HPE's RFI Response, nor on the vague statements in the December 18 letter.  Instead, MegaFon repeatedly sought specific assurances regarding HPE's experience and capabilities and the technical details of the proposed system, which HPE repeatedly claimed it  would meet MegaFon's technical requirements.  MegaFon was fully justified in relying on HPE's repeated assurances in entering into a contractual relationship.

110.   MegaFon has suffered damages flowing directly from HPE's negligent misrepresentations in an amount to be determined by the trier of fact.  MegaFon has invested at least $28 million dollars already in a defective UDR implementation that—despite HPE's many promises

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                                  p. 20

AmericasActive:12805953.1

to the contrary—fails completely, cannot be relied upon, and must either be scrapped or rebuilt.  Not only has MegaFon lost its original investment, but it now faces the prospect of unknown additional repair/replacement costs (estimates of which are as much as another $28 million), claims by MegaFon's end users, MVNO partners, and possibly its shareholders.  All of these damages would have been avoided had MegaFon not been enticed by HPE's negligent misrepresentations and instead used a different systems integrator.

### THIRD CAUSE OF ACTION

**UNFAIR COMPETITION**
**(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

111.    MegaFon incorporates ¶¶ 1-88 by reference.

112.    HPE's conduct set forth above with regard to MegaFon—involving numerous false promises and misrepresentations of HPE's experience, expertise, and capabilities, and the baseless and erroneous assurances that the UDR system would meet the contracted-for technical requirements— was unfair and deceptive, and constitutes "fraudulent business acts" under California's unfair competition law.  HPE knew or should have known that it did not have the asserted experience, expertise, and capabilities, and knew or should have known that it had no basis for its promises that the UDR system would meet the contracted-for technical requirements.

113.    These unfair and deceptive misrepresentations regarding the capabilities of its system have been ongoing, and include HPE's false assurances in 2015, 2016, and 2017 that additional hardware and software upgrades would solve the continued failure of the HPE-built UDR system to meet MegaFon's contracted-for technical requirements.  HPE knew or should have known that its hardware and software upgrades it proposed and implemented in 2015, 2016, and 2017 would not solve the continued failure of the HPE-built UDR system to meet MegaFon's contracted-for technical requirements.

114.    As stated above, MegaFon has suffered substantial damages flowing directly from HPE's deceptive business practices.  MegaFon has invested at least $28 million dollars already in a defective UDR implementation that—despite HPE's promises to the contrary—fails completely, cannot be relied upon, and must either be scrapped or rebuilt.  Not only has MegaFon lost its original

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                            p. 21

AmericasActive:12805953.1

investment, but it now faces the prospect of unknown additional repair/replacement costs (estimates of which are as much as another $28 million), and claims by MegaFon's end users and MVNO partners. All of these damages, as well as the harm to MegaFon's reputation, would have been avoided had MegaFon not been enticed by HPE's deceptive business practices and instead used a different systems integrator. HPE hereby requests that the Court order HPE to restore all property that it has acquired by means of the unfair competition described herein. This includes, at a minimum, all monies and fees paid by MegaFon to HPE and any of its affiliates related to the UDR system for which MegaFon contracted.

115.   The misconduct alleged herein is linked to the State of California, because defendant HPE is a California-based corporation, and some or all of the challenged conduct—including pre-formation promises from Mr. Carrero and belated assurances from HPE CEO Meg Whitman and HPE Executive Vice President Antonio Neri—emanated from California. This conduct also includes, but is not limited to, the generation of deceptive (if not outright fraudulent) marketing materials, and, on information and belief, at least some of the post-Response oral communications from HPE.

## **REQUEST FOR RELIEF**

WHEREFORE, MegaFon has suffered injuries as a result of the numerous misrepresentations of defendant HPE (and its predecessor-in-interest HP), MegaFon respectfully requests that the Court enter judgment against HPE alleged in this Complaint and award the following relief:

a.   Compensatory damages for the costs incurred by MegaFon from HPE's fraudulent inducement of the Framework Contract in an amount to be proven at trial ;

b.   Punitive damages for HPE's fraudulent inducement of the Framework Contract in an amount to be proven at trial, up to and including seven times the amount of compensatory damages;

c.   Compensatory damages for the costs suffered by MegaFon caused by HPE's negligent misrepresentation of material facts related to its experience, expertise, and capabilities in an amount to be proven at trial;

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                    p. 22

AmericasActive:12805953.1

1      d.      Restitution for the damages suffered by MegaFon as a result of HPE's deceptive

2              business practices, in an amount to be proven at trial;

3      e.      Pre-and post-judgment interest at the maximum rate allowable by the law; and

4      f.      Any other relief which this Court may deem just and proper.

5

6      Dated: October 23, 2018                    WINSTON & STRAWN LLP

7

8                                          By:   */s/ David S. Bloch*
                                                 David S. Bloch
9                                                W. Gordon Dobie (*pro hac vice* pending)

10                                               Attorneys for Plaintiff MEGAFON PJSC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                    p. 23

AmericasActive:12805953.1

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  October 23, 2018                    WINSTON & STRAWN LLP

                                                      By:   */s/ David S. Bloch*
                                                             David S. Bloch
                                                             W. Gordon Dobie (*pro hac vice* pending)

                                                      Attorneys for Plaintiff MEGAFON PJSC

COMPLAINT FOR FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION,
AND VIOLATION OF § 17200 – CASE NO. **3:18-cv-06463**                                        p. 24

AmericasActive:12805953.1